**Mark E. STAMEY, Plaintiff,**

v.

**NYP HOLDINGS, INC. and NYP Holdings, Inc. d/b/a New York Post, Defendants.**

**No. 02 Civ.8989(GBD).**

United States District Court,
S.D. New York.

Feb. 24, 2005.

Gil Chachkes, Brooklyn, NY, for Plaintiff.

Laura Davidson, Hogan & Hartson, LLP, New York City, J. Jordan Lippner, Vice President and Assistant General Counsel, News America, Inc., New York City, for The New York Post.

## MEMORANDUM OPINION & ORDER

DANIELS, District Judge.

News reporter brings suit against his former employer alleging violations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* and Title VII of the United States Code, for failing to accommodate his disability and for firing him because of his disability. Defendants submitted a motion for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons stated below, defendants' motion is granted and plaintiff's complaint is dismissed.[1]

## BACKGROUND

Plaintiff Mark E. Stamey brings this action under the Americans with Disabilities Act ("ADA") contending that he was terminated from his position as a reporter with the New York Post because he suffers from epilepsy. Stamey claims that the New York Post refused to offer him a reasonable accommodation and terminated him.[2] Stamey served as a General Assignment Reporter/Street Reporter with the New York Post from March of 1996 until he was terminated in August of 2002. In this role, plaintiff reported on breaking news stories, covering local stories of all types, including crimes, politics, human interest stories and entertainment.

Plaintiff has had a long history of medical problems which apparently began in August of 1996, after plaintiff suffered in-

---

1. By letter dated January 6, 2005, defendant argues that plaintiff's opposition papers were untimely and therefore should not be considered by the Court. The Court, however, has reviewed plaintiff's submissions and will review this motion on its merits.

2. Although plaintiff also alleges in his complaint that defendants violated Title VII, plaintiff has offered no proof of such claim. Indeed, plaintiff's complaint is devoid of any

allegations to support a Title VII claim. Title VII provides, in relevant part, that "it shall be unlawful for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000–e2(a)(1). This claim, therefore, is deemed abandoned and dismissed.

juries from being pushed down a flight of stairs while covering the crash of TWA Flight 800. Plaintiff alleges that after his accident, he felt "acute pain in his neck and head." Complaint ¶¶ 7–9. As a result of these injuries, Stamey received his first leave of absence with the New York Post from August 8, 1996 through February 26, 1997. Although plaintiff was not yet diagnosed with epilepsy, he claims that shortly thereafter, [he] began to suffer "tics, seizure, feelings of fear and severe dread, frequent sensations of falling, sleeplessness, fever, memory loss, vertigo, hallucinations and other classic symptoms of epilepsy." Complaint ¶ 10.[3]

Plaintiff apparently worked until the fall of 2000, when the Post granted him a second medical-related leave of absence. From December 5, 2000 through July 14, 2001, plaintiff was on short-term disability leave and was paid by the Post over $15,000 in short term disability benefits for Post Traumatic Stress Disorder.[4] On July 2, 2001, plaintiff provided reports prepared by his doctor for UNUM, the Post's disability insurance carrier. On July 5, 2001, plaintiff submitted a letter, also signed by his doctor, stating that plaintiff suffered from post traumatic stress disorder and that plaintiff had been receiving medication and psychotherapy for several months leading up to July 5, 2001. The doctor further recommended that "it would be advisable" if Stamey could "avoid assignments that involve crime and violence," and that plaintiff should be reassigned from the night shift and to a job that did not involve "excessive driving." Carvalhido Aff., ¶ 8.

It is undisputed that the Post, in response to plaintiff's request and after receiving his doctor's letter, attempted to accommodate plaintiff when he returned to work on July 14, 2001. The Post placed plaintiff on the day shift and conformed to the recommendations made by his doctor. Plaintiff claims, however, that on July 14, 2001, he suffered an epileptic seizure while driving. He was taken to Lincoln Hospital where he fell into a coma that lasted five days. Upon *regaining consciousness*, he was told that he suffered from epilepsy and was referred to a neurologist who confirmed the diagnosis and prescribed a regimen of medication.

Stamey claims that he returned to work but that his condition worsened, causing him to suffer extreme nausea, Grand Mal seizures, Auras and prolonged periods of unconsciousness. In August 2001, "after being assigned to several days of extended stakeouts and exposure to extreme temperatures, Stamey pleaded for a change of duties." *Id.*, ¶ 19. Between August 2001 and March 2002, Stamey "missed substantial time from work due to his symptoms." Complaint, ¶ 20. On March 18, 2002, after a series of seizures, Stamey was referred to the New York University Comprehensive Epilepsy Center (the "Center"). On March 27, 2002, he was examined and was referred for in-patient treatment.

The next day, March 28, 2002, plaintiff advised the N.Y. Post Editor of his diagnosis and placement and requested a leave of absence from work. This request was plaintiff's third medical related leave of absence. The Editor granted his request. On April 1, 2002, plaintiff was admitted to the Center. "He was released on April 5,

---

**3.** Stamey continued to work, but his condition worsened.

**4.** In his complaint, plaintiff alleges that he was diagnosed with Post Traumatic Stress

Disorder in 1998, after seeking medical treatment at the Forest Hills Psychiatric Services Center.

2002 and was ordered not to return to work." *Id.* ¶ 23. Plaintiff then advised his Editor of his condition and arranged to call him on a weekly basis. The Post credited this time as a leave pursuant to the Family and Medical Leave Act ("FMLA") though Stamey was not at that time eligible for such leave because, "based on the fact that he had been on a prior leave of absence, he had not worked the statutorily required number of minimum hours in the year leading up to the leave." Carvalhido Aff. ¶ 13. The Post advised plaintiff that his leave was being treated as FMLA leave and that it would run from March 28, 2002 through June 20, 2002. On June 13, 2002, Stamey's epileptologist submitted a letter stating that Stamey was "able to return to work under slightly modified conditions: no extended stake outs on the street; no excessive driving; accommodations for sick days, i.e. work at home when transportation is a problem; a later shift than previous 7AM starting time." Defendants' Exhibit D.

The Post claims that plaintiff did not return to work on June 21, 2002 as expected. One week later, on June 28, 2002, plaintiff met with the Metropolitan Editor/City Desk Editor and the Administrative Editor from whom he "requested an extended leave of absence." *Id.* ¶ 26. Plaintiff brought with him additional medical documentation including a letter dated June 28, 2002 from the NYU Medical Center stating that plaintiff "was admitted to NYU Medical Center on June 19 through June 24 for In-patient Veeg Monitoring." Defendants' Exhibit E. Plaintiff also brought another note from his epileptologist dated June 28, 2002 stating that Stamey had been diagnosed with epilepsy, had been recently hospitalized and, as a result of the seizures, was unable to drive. Defendants' Exhibit F. Plaintiff claims that he "explained the nature of his condition and the required treatment to [the Metro-politan Editor], explained that his disease could be effectively managed and controlled with medication and explained that it would take approximately one year to do this." *Id.* ¶ 26. He contends that his request for an extended leave was denied.

Defendants offered plaintiff a restructured position which the Editors titled "assignment reporter." Carvalhido Aff., ¶ 18. This restructured position was a five day a week job that would require plaintiff to make phone calls, do research and write stories while working in the office for 7.5 hours per day with no requirement that he drive a car or work out on the streets. *Id.*, ¶ 20. Plaintiff refused the restructured position and asked instead for a continued leave of absence without indicating how long the leave of absence would be.

Plaintiff spoke to the N.Y. Post Vice President of Finance who requested additional documentation from plaintiff about his illness. The Post sought "certain specified information concerning plaintiff's alleged medical condition, his medical need for a reasonable accommodation, and his ability to return to work and perform his essential functions of his job with or without a reasonable accommodation." Answer at 4, ¶ 28. The July 1, 2002 letter also reiterated the Post's offer of the restructured position. On July 2, 2002, defendant received another note from plaintiff's epileptologist concerning Stamey's medical condition. The letter stated that plaintiff

has a history of epilepsy.... He has experienced frequent convulsions starting the summer of 2001.... Mr. Stamey's convulsions have been life threatening.... [Plaintiff] has been on at least three anti-seizure medicines that have been manipulated but the seizures still persist.... If these drugs do not ameliorate his condition satisfactually

(sic) he will have further drug manipulations. This process is one that typically takes months and sometimes even years for stabilization. The results of medical manipulation cannot be known at the present. The success of therapy is only revealed when someone has a long seizure free interval. Currently that is not the case.... Ultimately if medicines do not control the seizures he may be under consideration for a brain tissue removal. How this will evolve over this year or the next years is not known. It is a process.... I cannot decide on how to define or redefine his work satisfactually (sic). This is the decision and contemplation of his employer. That he cannot drive is a legal fact. That seizures associated with prolong (sic) loss of consciousness out in the field risks injury is obvious.

Defendants' Exhibit H. This letter was unresponsive to its request. Carvalhido Aff., ¶ 25.

On July 1, 2002, the Vice President of Finance offered plaintiff a desk job, provided that plaintiff "work five days a week and write twelve inches of copy per day." Complaint ¶ 30. Plaintiff contends that "this was not a reasonable accommodation." *Id.* Plaintiff told the Vice President of Finance that "he was still unable to return to work on a full-time basis." *Id.* ¶ 31. Plaintiff told the Vice President of Finance that "because of his medication, he was unable to travel every day, unable to sit at his desk for so long and could not be held to a quota." *Id.* Plaintiff informed the Vice President of Finance that "it would take time to stabilize his condition and asked [him] to hold his job." *Id.*

On July 11, 2002, another of plaintiff's doctors wrote a letter indicating that plaintiff was "under [her] care for the treatment of a neurocognitive medical condition precipitated by an assault sustained in the line of duty while on a work assignment." The doctor advised that plaintiff "continues to be in need of care at this time, and is not yet cleared for attendance at work and resumption of normal work duties." Defendants' Exhibit I. In response, the Vice President of Finance wrote to plaintiff,

> [a]s I am sure you are aware, in that letter Dr. [ ] states that you are not cleared to return to work and resume your "normal work duties." In light of your doctor's letter, we are offering to you as an accommodation a change in your job from that of a Street Reporter to an assignment reporter working from the office. In this new capacity, you will not be required to go out in the streets and cover stories. Rather, you will be required to work 5 days a week and 7.5 hours per day from the office. You would be expected to make phone calls, do research and write stories from the office.

Defendants' Exhibit J. The letter further invited plaintiff to meet with the Vice President of Finance prior to Monday, July 22.

After plaintiff did not respond, the Vice President of Finance again wrote a note reiterating the offer of a new position. "Because we have not heard back from you, we are assuming that you do not have an alternative reasonable accommodation that you would like us to consider. Consequently, ... please report to work on Monday, July 29, to begin working as an assignment reporter." Defendants' Exhibit K. Plaintiff did not report to work on July 29, 2002. On August 2, 2002, plaintiff called and scheduled an appointment with the Vice President of Finance. According to the Vice President, during this meeting, plaintiff "told [me] that he wanted to return to work but was still having seizures. I told him again that if the position we had

offered him was not tenable, he needed to get medical documentation describing his limitations so we could determine what position he might return to." Carvalhido Aff., ¶ 30. The meeting ended with an agreement to meet on August 5 with the Administrative Editor. Later that day, plaintiff left a note seeking to reschedule the meeting from August 5 to August 8. Plaintiff never arrived for the August 8, 2002 meeting. He did not call to cancel or to explain his absence. Rather, Stamey's then lawyer "wrote to the Post complaining that Stamey did not have enough time to get the requested medical documentation" and requesting that the Post give Stamey until August 15 to submit the documentation. Carvalhido Aff., ¶ 33.

On August 9, 2002, the Post's Assistant General Counsel responded to plaintiff's attorney's letter clarifying the Post's repeated requests for plaintiff's medical documentation. Specifically, the letter requested documentation that would either: (i) clear him to return to work, (ii) explain why he has been absent from work, (iii) explain why he is unable to perform his job as a Street Reporter or the offered accommodation of an assignment reporter, and (iv) explain if he will be able to return to work in the future and perform the essential functions of his job as a Street Reporter and, if so, when.

Defendants' Exhibit M. The letter reiterated the Post's position that their employment offer as an assignment reporter was a reasonable accommodation given the medical information they had been provided by the plaintiff.

> The only medical documentation Mr. Stamey has provided indicates an inability to drive or perform (in some unspeci-

fied way) the normal duties of a Street Reporter. The job of an assignment reporter, with its office environment and regular daytime hours, fully accommodates the limitations we know about.

*Id.* The letter concluded that

> You had previously requested that Mr. Stamey be afforded until August 15. We will do better than that. Mr. Stamey will be given until August 19 … either to (a) report to work as an assignment reporter, (b) reach agreement with [the Vice President] as to a reasonable accommodation, or (c) provide [the Vice-President] with medical documentation specifying when exactly he will be able to return to work as a Street Reporter, with or without a reasonable accommodation. If he fails to comply, the Post will have no choice but to terminate his employment.

*Id.*

Plaintiff did not submit any additional medical documentation. He did not appear for work on August 19, 2002. Sometime between August 23 and August 30, 2002, plaintiff was terminated from his employment by the N.Y. Post.[5] Plaintiff filed the instant lawsuit on November 12, 2002 alleging claims under the ADA and Title VII. Plaintiff also asserted a state law claim of breach of contract.

Defendants move for summary judgment contending that plaintiff's request for an indefinite leave of absence was not a reasonable accommodation under the ADA, and that as an appropriate accommodation, plaintiff was offered another position which he rejected. The defendants contend, as a matter of law, that the alternative position offered to the plaintiff was

---

5.  Plaintiff alleges in his complaint that he was terminated on August 23, 2002 while defendants assert that plaintiff's termination date

was August 30, 2002. The disagreement concerning plaintiff's termination date is not relevant to the Court's decision.

a reasonable accommodation under the ADA.

## DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 1694, 123 L.Ed.2d 317 (1993). The burden of demonstrating that no factual dispute exists is on the moving party. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In deciding a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment should be granted only when no reasonable trier of fact could find in favor of the nonmoving party. *See Gallo v. Prudential Residential Services, Ltd.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The general rule under the ADA is that "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual...." 42 U.S.C. § 12112(a). Because plaintiff alleges employment discrimination under the ADA, he bears the initial burden of establishing a *prima facie* case. *See Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869 (2d Cir.1998). To establish a *prima facie* case of discrimination under the ADA, plaintiff must show that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Giordano v. City of New York,* 274 F.3d 740, 747 (2d Cir.2001); *Wernick v. Fed. Reserve Bank of New York,* 91 F.3d 379, 383 (2d Cir.1996); *see also Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 149–50 (2d Cir.1998).

It is undisputed that Stamey was disabled within the meaning of the statute. It is further unchallenged that the Post is subject to the ADA, was aware of plaintiff's diagnosis, and that defendant terminated plaintiff's employment. The central dispute between the parties, therefore, is whether plaintiff can prove that he was a qualified individual with a disability. In establishing whether or not Plaintiff was "otherwise qualified" to perform his job at the Post, plaintiff bears the burden of production and persuasion with respect to whether he is otherwise qualified. *See Borkowski v. Valley Central School Dist.,* 63 F.3d 131, 137 (2d Cir.1995); *accord Mendes v. Jednak,* 92 F.Supp.2d 58, 65 (D.Conn.2000). Plaintiff is not otherwise qualified unless he is able, with or without reasonable accommodation, to perform the essential functions of the job in question. *See Borkowski,* 63 F.3d at 138; *Gilbert v. Frank,* 949 F.2d 637, 642 (2d Cir.1991).

Defendants contend that plaintiff was not a qualified individual with a disability because he was medically unable to work and the only accommodation he sought, an indefinite leave of absence, was not reasonable as a matter of law. Defendant also contends that it offered plaintiff a reasonable accommodation which plaintiff rejected. Plaintiff disputes that he requested an "indefinite" leave of absence, and argues that he was otherwise qualified to perform

the essential functions of his job "if given a reasonable accommodation in the form of a leave of absence and that the accommodation the Post did offer, which amounted to a desk job, was unreasonable in light of what it knew of Stamey's medical condition." Plaintiff's Brief at 1.

The ADA does not require an employer to grant an employee an indefinite leave of absence. *See Mitchell v. Washingtonville Central School District,* 190 F.3d 1, 9 (2d Cir.1999); *see also Wisneski v. Nassau Health,* 296 F.Supp.2d 367 (E.D.N.Y.2003); *see also Walton v. Mental Health Ass'n,* 168 F.3d 661, 671 (3d Cir. 1999); *see also Nowak v. St. Rita High Sch.,* 142 F.3d 999, 1004 (7th Cir. 1998)("The ADA does not require an employer to accommodate an employee who suffers a prolonged illness by allowing him an indefinite leave of absence."); *see also Rogers v. Int'l Marine Terminals, Inc.,* 87 F.3d 755, 759–60 (5th Cir.1996)("While Rogers contends that IMT was required to accommodate him by allowing him to enjoy indefinite leave, this argument is meritless."); *see also Hudson v. MCI Telecomm. Corp.,* 87 F.3d 1167, 1169 (10th Cir.1996)(plaintiff failed to present any evidence of the expected duration of her impairment as of the date of her termination); *see also Myers v. Hose,* 50 F.3d 278, 283 (4th Cir.1995)("Nothing in the text of the reasonable accommodation provision requires an employer to wait an indefinite period for an accommodation to achieve its intended effect.").

Plaintiff's request for an accommodation was one for an indefinite period of leave.[6] In response to plaintiff's request, the New York Post asked plaintiff for medical documentation to which plaintiff submitted the following letters:

- On June 13, 2002, Stamey's epileptologist submitted a letter stating that plaintiff was "able to return to work under slightly modified conditions: no extended stake outs on the street; no excessive driving; accommodations for sick days, i.e. work at home when transportation is a problem; a later shift than previous 7AM starting time." Defendants' Exhibit D.

- A letter dated June 28, 2002 from the NYU Medical Center stated that plaintiff "was admitted to NYU Medical Center on June 19 through June 24 for In-patient Veeg Monitoring." Defendants' Exhibit E.

- A letter dated June 28, 2002 from his epileptologist stated that plaintiff had been diagnosed with epilepsy, had been recently hospitalized and, as a result of the seizures, was unable to drive. Defendants' Exhibit F.

- On July 2, 2002, defendants received another note from plaintiff's epileptologist stating that plaintiff "has a history of epilepsy.... If these drugs do not ameliorate his condition satisfactually (sic) he will have further drug manipulations. This process is one that typically takes months and sometimes even years for stabilization. The results of medical manipulation cannot be known at the present. The success of therapy is only revealed when someone has a long seizure free interval. Currently that is not the case.... Ul-

---

**6.** The record shows that defendant New York Post granted plaintiff's request for leave from August 8, 1996 through February 26, 1997. The Post granted plaintiff's second request for leave from December 5, 2000 through July 14, 2001. Between August 2001 and March 2002, it is undisputed that plaintiff "missed substantial time from work due to his symptoms." Complaint, ¶ 20. Finally, defendant granted plaintiff's request for leave from March 28, 2002 to June 21, 2002. This last leave was extended to August 19, 2002 after plaintiff failed to report to work on June 21, 2002.

timately if medicines do not control the seizures he may be under consideration for a brain tissue removal. How this will evolve over this year or the next years (sic) is not known. It is a process.... I cannot decide on how to define or redefine his work satisfactually (sic). This is the decision and contemplation of his employer. That he cannot drive is a legal fact. That seizures associated with prolong (sic) loss of consciousness out in the field risks injury is obvious". Defendants' Exhibit H.

- On July 11, 2002, another doctor wrote a letter indicating that plaintiff was "under [her] care for the treatment of a neurocognitive medical condition precipitated by an assault sustained in the line of duty while on a work assignment." The doctor advised that plaintiff "continues to be in need of care at this time, and is not yet cleared for attendance at work and resumption of normal work duties." Defendants' Exhibit I.

These letters highlight the fact that plaintiff's doctors could not assess when plaintiff could return to work. The earlier letters emphasized plaintiff's need for an altogether different accommodation: there could be no extended stake outs on the street; no excessive driving; accommodations for sick days, i.e. work at home when transportation is a problem; a later shift than previous 7AM starting time. Defendant was willing to accommodate all of these requests. The later letters, unfortunately, indicated the doctors' inability to diagnose, with any certainty, plaintiff's re-

turn to work under any conditions. Indeed, the July 2, 2002 letter from his epileptologist questions the amount of time plaintiff required to recover. "How this will evolve over this year or the next years is not known. It is a process.... I cannot decide on how to define or redefine his work satisfactually." Defendants' Exhibit H. The other doctor's letter indicated plaintiff's inability to work and fails to provide any period of time when plaintiff might return to work. Thereafter, plaintiff neither reported to work nor submitted any further medical documentation.

Plaintiff has submitted two affidavits: one from his daughter and one from his epileptologist.[7] Plaintiff's daughter attested that she communicated with the Post concerning plaintiff's failure to return to work at the conclusion of his FMLA leave. Plaintiff's epileptologist attests that he spoke with the City Desk Editor on or about July 17, 2003, almost one year after plaintiff's August, 2002 termination, and after this lawsuit was filed. *See* Ritaccio Affidavit, ¶ 14. The epileptologist swears that he "told [the City Desk Editor] in no uncertain terms that [plaintiff] was presently too sick to work in any capacity but that his condition would ultimately stabilize. I said that it would take a few months before I could predict a return date." His epileptologist further attests that he assured the City Desk Editor that plaintiff "would not be out indefinitely, but would be able to return to work, that [his epileptologist] was beginning to see positive signs of his recovery, and that in a few months, [his epileptologist] would be able to accurately determine a return date."[8]

---

**7.** Defendants argue that the Court should exclude these affidavits from the record because of plaintiff's failure to comply with Fed. R.Civ.P. 26(a)(1)(A) and 26(e). Specifically, defendants contend that plaintiff failed to

identify either the doctor or plaintiff's daughter in his Rule 26(a) Required Disclosures.

**8.** Defendants, through the affidavit of the City Desk Editor, contest that this conversation

His epileptologist's statement, however, does not provide any indication that plaintiff would or could return to work on a certain date. Indeed, his affidavit, like his letter of July 2, 2000, states only that the doctor may be able to predict a return date after a few months. Moreover, none of this information was provided to defendant prior to plaintiff's termination in response to defendants' repeated requests for more specific information.

There is no evidence before this Court, therefore, that plaintiff could have returned to work, and was merely asking for a *temporary* leave of absence, as opposed to an *indefinite* leave of absence. All of the cases plaintiff cites fail to support his argument. In *Criado v. IBM Corp.,* 145 F.3d 437 (1st Cir.1998), the First Circuit held that a leave of absence and leave extension are reasonable accommodations in some circumstances under the ADA. Specifically, however, the court relied on plaintiff's evidence that her leave would be temporary and "would allow her physician to design an effective treatment program." *Id.* at 8. Furthermore, the court pointed to defendant's policy of providing 52 weeks of paid disability leave which the court found prevented defendant "from asserting that Criado's leave produced an undue burden on its operations" and the fact that "Criado's was not asking for more leave than would be granted to a non-disabled, sick employee." *Id.; see also Cehrs v. Northeast Ohio Alzheimer's Research Center,* 155 F.3d 775 (6th Cir.1998)(finding that no presumption should exist that uninterrupted attendance is an essential job requirement and that medical leave of absence can constitute a reasonable accommodation under the ADA in appropriate circumstances).

Plaintiff also cites *Durrant v. Chemical/Chase Bank/Manhattan,* 81 F.Supp.2d

518 (S.D.N.Y.2000) for the court's holding that defendant failed "to establish that there is no genuine issue as to whether plaintiff was a qualified individual in that she could have returned to work and performed the essential functions of her job had the bank afforded her reasonable accommodation, i.e., an addition leave of absence." *Id.* at 522. The court, in dicta, stated that "[w]hile the bank surely would not have been obliged to afford plaintiff an indefinite or unlimited leave, the Court cannot now exclude the possibility that a shorter leave might have been a reasonable accommodation" *Id.,* at 522, n. 17. Indeed, the court cited to evidence in the record that defendant "terminated plaintiff after a prolonged medical leave precisely because it learned that her problems had extended into the mental health sphere." Furthermore, the court found that plaintiff was

> entitled on this motion to the benefit of the inference that the bank knew ... that she was not capable of responding to its inquiry, yet made no serious effort to ascertain her condition before firing her, let alone to learn whether some brief or reasonable extension of her leave would enable her to return to work.

*Id.* Unlike the defendant in *Durrant,* defendants in the present case clearly made attempts to determine the nature of plaintiff's illness and repeatedly sought medical documentation to assess reasonable accommodations.

Plaintiff's citation of the district court's opinion in *Powers v. Polygram,* 40 F.Supp.2d 195 (S.D.N.Y.1999), is also unavailing. In *Powers,* the district court compared plaintiff's request for a seventeen-week leave of absence to the length of absences requested by other plaintiffs in

---

between Dr. Ritaccio and the City Desk Edi-

tor ever took place.

other cases, ultimately finding that it could not, as a matter of law, rule that plaintiff's request for a seventeen-week leave of absence renders plaintiff legally unqualified to work. The court held, therefore, that

> [t]he facts here impel us strongly to the conclusion that, at least, there is a triable issue as to the reasonableness of the leaves sought by plaintiff. Despite the complexity and uncertain course of mental illness, plaintiff and his doctor were able to give a reasonable estimate as to when he would be able to return to work.

*Id.* at 202. Indeed, the district court ultimately concluded that a requested leave of absence is an unreasonable request for accommodation, as a matter of law, only in unusual circumstances. One of those circumstances is "where the request is for a very long leave of absence, such as one year (although we do not here hold that any exact number is the 'red line' that demarcates the reasonable from the unreasonable)." *Id.* at 201. Similarly, plaintiff's reliance on *Rogers v. New York University,* 250 F.Supp.2d 310 (S.D.N.Y.2002) is unhelpful. In *Rogers,* the district court found a disputed issue of fact sufficient to defeat summary judgment that plaintiff "could, with or without accommodation, perform the essential functions of her employment." *Id.* at 315. Plaintiff's therapist stated, during her deposition, that plaintiff could have met the responsibilities of her job and that plaintiff could return to work if her leave was extended a definite period. *Id.* Unlike the plaintiffs in either *Powers* or *Rogers,* however, plaintiff in the present case could not, and did not, identify any period of time that he needed for a leave.

Stamey has presented no evidence concerning when he would or could return to work. The evidence is undisputed that plaintiff was unable to work, that his doctors were unable to tell him when he could return to work and that, at least up to the date of his deposition on July 24, 2003, he still was not cleared to work.[9]

■ The factual record indicates that defendant New York Post made every attempt to communicate with plaintiff and determine a reasonable and suitable course given plaintiff's deteriorating health. The Post afforded plaintiff numerous medical leaves of absence. It extended plaintiff's final leave of absence. It offered plaintiff a new job as an assignment reporter that accommodated plaintiff's needs as outlined by his doctor. All the Post asked for was medical documentation that supported whatever accommodation plaintiff sought. Plaintiff took those leaves of absences. Plaintiff rejected the offer of a new job and reiterated that the only accommodation he felt was reasonable was an indefinite leave of absence. This request is clearly not reasonable under the law, particularly in light of defendants' offer of a different position and adjusted working condition as a reasonable accommodation. *See Budd v. ADT Security Systems, Inc.,* 103 F.3d 699, 700 (8th Cir.1996)(stating, in dicta, that the fact that "the defendant has offered plaintiff other jobs, which he has turned down, does nothing but strengthen the defendant's case.").

9. During his deposition on July 24, 2003, plaintiff was asked the following questions and gave the following responses:

Q: I asked you about your own occupation. But now I'm asking if you agree with your doctor's analysis about you being incapable of working in any occupation in December '02.
A: The doctor says here I'm unable to work in any occupation.

Q: You can disagree with your doctor. That's my question, whether you agree with him or disagree with him.
A: No. I'm not going to disagree with my doctor. If the doctor says that's the way it is—I can hope otherwise. I could like want—I mean, look. I want to work. I would love to disagree with this.

Plaintiff has therefore failed to establish that he was a "qualified individual" as defined by the ADA. Plaintiff's request for a leave of absence without any anticipated return date was unreasonable in light of the circumstances of this case, especially in light of defendants' offer of a new position as a reasonable accommodation. Plaintiff could not perform the essential functions of his job either with or without a reasonable accommodation. *See McNeil v. Scotland County,* 213 F.Supp.2d 559 (M.D.N.C. 2002) ("[a]lthough plaintiff does not use the term indefinite leave, the evidence indicates that plaintiff was seeking indefinite leave."); *see also Wood v. Green,* 323 F.3d 1309 (11th Cir.2003)(finding that there is nothing in the text of reasonable accommodation provision of the ADA which requires an employer to wait for an indefinite period for accommodation to achieve its intended effect).

### BREACH OF CONTRACT

Plaintiff also alleges a state law claim for breach of contract. Defendants have moved for summary judgment on this claim, arguing that plaintiff "did not have an employment contract with the Post." Carvalhido Aff. ¶ 42. Defendant contends that plaintiff was employed at will and could have been terminated from employment by the Post with or without cause for any or no reason.

Plaintiff does not challenge defendants' argument, nor has he produced a employment contract in support of his claim. His breach of contract claim is therefore also dismissed.

### CONCLUSION

Defendants' motion for summary judgment is granted and plaintiff's complaint is dismissed in its entirety.