# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

MARY HAYES GUILFOIL V. ADELAIDE M. GRADY HAYES, ETC.

January 13, 1938.

Present, Campbell, C. J., and Holt, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*James E. Heath*, for the appellant.

*W. L. Parker*, for the appellee.

EGGLESTON, J., delivered the opinion of the court.

Mary Hayes Guilfoil filed her bill in the court below attacking the validity of the will of William R. Hayes, which had been admitted to probate in the clerk's office of said court within the preceding two years. The bill alleged that the decedent was at the time of his death domiciled in the State of New York, and had been for many years prior thereto; that the complainant was his sole heir at law and distributee under the laws of that State; that the said William R. Hayes was mentally incompetent to make the said will; and that it had been procured through the undue in-

fluence of the defendant, Adelaide M. Grady Hayes, who was therein named as the executrix and principal beneficiary.

The defendant, Adelaide M. Grady Hayes, filed a plea to the said bill of complaint, in which she averred that the said William R. Hayes was at the date of his death domiciled in the State of Virginia; that she was his lawful wife; that there were no children born of this or of any former marriage of the said decedent, nor had the decedent ever adopted a child; that the said decedent, at the time of his death, owned no real estate, or any interest therein, but that his estate consisted wholly of personal property; that if the said decedent died intestate (as alleged in the bill), the whole of his estate descended to her, the said defendant, under the laws of the State of Virginia; and that the complainant was not a "person interested" in the said will, or in the order admitting the same to probate, as had the right, under Code, section 5259, to institute a suit to impeach the said will.

Issue was joined and the matter proceeded to trial on this plea.

The precise question submitted to the lower court was clarified and restricted by the agreement between the parties as to the following pertinent matters, both of law and fact:

The testator and the appellee (defendant below) were lawfully married and so continued until his death. His estate consisted of personal property only, the distribution of which is determined by the law of his domicile at the date of his death. If the decedent died intestate and domiciled in Virginia, his wife (the defendant below) inherited the entire estate involved in this litigation, and the contestant is not such a "person interested" under Code, section 5259, as may maintain this suit.

The defendant below admitted that prior to the latter part of the year 1933 her husband was domiciled in New York. She also conceded that the burden of establishing a change of domicile was on her as the party alleging it.

The sole question, therefore, presented to the court below was whether the preponderance of the evidence showed that there was a change of domicile from New York to Virginia.

Upon a consideration of the whole evidence, taken partly in open court and partly by depositions, the trial court decided the issue in favor of the Virginia domicile, and entered a decree dismissing the bill. Hence this appeal.

The evidence shows these facts: The testator was a Catholic priest. For many years prior to 1932 he had been pastor of a church in the city of Newburgh, New York. He was a man of means, living in a valuable residence, which he owned. In 1931 and 1932 he underwent several operations, which left his health impaired. Consequently, in 1932, he retired from active duty, became pastor *emeritus* of his church, and thereafter received a monthly salary of $100. He was then sixty-six years of age.

In July, 1932, the will in controversy was drawn and executed at Newburgh. The appellee, to whom he was not then married, was named as the principal beneficiary and executrix.

In September, 1932, Father Hayes and the appellee went to Norfolk and thence to Elizabeth City, North Carolina. At the latter place they were married in a civil ceremony by a justice of the peace on September 12, 1932. They returned at once to Norfolk and from there went to Virginia Beach, stopping at a hotel.

After a brief stay at the hotel Father Hayes rented a cottage at Virginia Beach, where he lived with his wife until the spring of 1933, when he returned to Newburgh. At that time his wife returned to New York City, where she had previously resided.

Upon his return to Newburgh, after having first tried in vain to sell his residence, he converted it into an apartment house and leased it for a term of five years. This property he subsequently conveyed to Mrs. Hayes. He removed his household furniture to New York City, where

he stored it, telling the warehouseman that he intended to move it to Virginia Beach at a later date.

In the fall of 1933 the couple returned to Virginia Beach and occupied the Stickney cottage. Father Hayes closed his bank account at Newburgh and opened one at the Virginia Beach branch of The National Bank of Commerce at Norfolk. This was the only bank account thereafter maintained by him.

He rented a safe-deposit box in the Norfolk office of that bank and transferred all of his securities thereto from the Newburgh bank. When making this transfer he told Mr. Coleman, the custodian of the vault, that thereafter he intended to make Virginia Beach his home.

Father Hayes had considerable dealings with Mr. W. H. Terry, Jr., who was engaged in the real estate and rental business at Virginia Beach. Through Mr. Terry he rented a cottage in the fall of 1932, and the Stickney cottage in the fall of 1933. He frequently discussed with Mr. Terry his hopes and plans for a permanent home at Virginia Beach. He stated to Mr. Terry (as well as to others) that his health had been much improved by the climate there.

In the latter part of 1933 he told Mr. Terry that Mrs. Hayes had finally consented to make her permanent home at Virginia Beach, and he requested Mr. Terry to obtain for him a building site in order that he might erect a residence thereon. A satisfactory lot was acquired through Mr. Terry, and the title thereto was taken in the name of Mrs. Hayes. After the lot had been purchased Mr. Terry drew the plans for the house and conferred with the contractor. In discussing the character of the residence to be constructed Father Hayes impressed on Mr. Terry and the contractor that he intended the house as his permanent home.

The building site selected by Father Hayes and his wife was purchased from one W. F. Crockett, after protracted negotiations. When the contract had been signed Father Hayes told Mr. Crockett that Mrs. Hayes had finally agreed to a home at Virginia Beach, and that he would be proud of and glad to live in his own home there.

The contract for the erection of the house was let to Conrad Brothers, contractors in the city of Norfolk. Father Hayes had many conferences with Mr. Arthur Conrad of this firm relative to the details of the house. To Conrad's suggestion that the price might be reduced by substituting cheaper materials, he replied that he was building this house, not for rental purposes, but for his own home, and that he wanted it so constructed that it could be occupied by him throughout the entire year.

The plans finally agreed on contemplated a substantial two-story house and double garage. It was to be heated by hot water with an oil furnace. Downstairs there were a living room, center hall, dining room, breakfast room, kitchen, furnace room, and lavatory. Upstairs there were four bed rooms, two baths, and servants' quarters over the garage. The final contract price agreed on was $11,380, and the building was to be ready for occupancy on or before July 1, 1934.

Father Hayes obtained, through the local bank, a temporary loan for financing the construction of this residence. He stated to the officer of the bank that the funds were to be used for building a home at Virginia Beach.

In March, 1934, his automobile, driven by his chauffeur, was involved in a collision. Litigation arising out of the accident reached the trial justice for Princess Anne county. While Father Hayes denied liability for the accident, he told the trial justice that he was "living at Virginia Beach and being a new resident" there he preferred to pay the damages rather than litigate the matter.

Early in April, 1934, Father Hayes prepared to leave for New York City for what he considered a minor operation. The contract for the building of his home had been let and the work started. His lease on the Stickney cottage would expire May 1st. Before leaving he requested a friend, Stagg, to arrange for him a lease of a small apartment for occupancy in the interim between May 1st and the date of the completion of his residence. To Stagg, of whom he saw

a great deal, he often stated his intention to make Virginia Beach his home.

Shortly before going to the hospital in April, 1934, Father Hayes visited his church at Newburgh and inquired of conditions there. On this occasion he dined at the rectory with the priest in charge and requested payment of his over-due salary.

Following a slight operation at a hospital in New York City, he suffered a hemorrhage and died on April 27, 1934. Funeral services were held over his remains as a Catholic priest, and he was buried as such.

Up to that time no one in New York, except Mrs. Hayes' sister, knew of the marriage. So far as the record discloses no one at Virginia Beach had known that he was a Catholic priest.

Under the laws of the Catholic church his marriage was prohibited. Had it been disclosed he would have been subject, as the evidence shows, to immediate excommunication.

To several of his friends and parishioners in Newburgh he had stated, just before leaving there for Virginia Beach in the fall of 1933, that he was spending the winters at Virginia Beach for his health, but that Newburgh would always be his home.

On December 23, 1933, he filed a signed application for an automobile license with the Bureau of Motor Vehicles of the State of New York, in which he stated, as he had previously done in similar applications, that Newburgh was his residence.

In a liability policy covering this automobile, issued on March 10, 1934, Newburgh is stated to be his residence. This policy was written at Newburgh. There is in the record no signed application for this insurance, nor does the evidence disclose upon what information the policy was issued.

This is a fair summary of the pertinent evidence which comes from the witnesses for both sides.

■ It is recognized by all the authorities that no lapse of time is necessary in order to effect a change of domicile. Only two elements are required. There must exist the fact of personal presence in the new place, coupled with the intention to make that new place a home.

■ The principle is thus stated in Minor's Conflict of Laws, p. 114, sec. 59: "It must be observed that neither presence alone, nor intention alone, will suffice to create a domicil of choice. Both must concur, and at the very moment they do concur the domicil is created. As it is sometimes expressed, the *factum* (presence) and the *animus* (intention) must unite. And thereafter no change of locality alone (there being no change of intent), or, *vice versa*, no change of intention (there being no change of locality) will effect an alteration of the domicil of choice, which remains where it was, until the *factum* and the *animus* again unite."

See *Cooper's Adm'r* v. *Commonwealth*, 121 Va. 338, 347, 93 S. E. 680; *Talley* v. *Commonwealth*, 127 Va. 516, 521, 103 S. E. 612.

■ In denoting the character of the intention required to effect a change of domicile, this court in *Commonwealth* v. *Rutherfoord*, 160 Va. 524, 538, 169 S. E. 909, 914, 90 A. L. R. 348, quoted with approval the following language from *Williamson* v. *Osenton*, 232 U. S. 619, 625, 34 S. Ct. 442, 58 L. Ed. 758:

" 'The essential fact that raises a change of abode to a change of domicile *is the absence of any intention to live elsewhere* (Story, Conflict of Laws, section 43) ; or, as Mr. Dicey puts it in his admirable book, *"the absence of any present intention of not residing permanently or indefinitely in"* the new abode. Confl. L. (2d Ed.) 111.' "

Counsel for the respective parties agree that these are correct statements of the principles of law here involved. Their disagreement is merely as to the application of these principles to the facts before us.

The fact of the personal presence by Father Hayes in the new place—Virginia Beach—is, of course, admitted.

The only open question is, From the detailed facts and circumstances what must we infer was the real intention of Father Hayes? Do these facts and circumstances show that he intended to maintain his domicile in Newburgh, or do they prove that he intended to give up that domicile and establish another at Virginia Beach?

In *Bowen* v. *Commonwealth,* 126 Va. 182, 190, 101 S. E. 232, 234, in speaking of proof of intent with respect to a change of domicile, this court said: "Intent is to be inferred from declarations and from conduct. And it is a well settled rule that evidence of expressed intent has no controlling weight if such an intent is inconsistent with the acts and general conduct of the person. In such a case, acts and conduct showing intent outweigh his declarations or expressions of intent."

We think that the trial court was right in inferring, both from the acts and declarations of Father Hayes, that he intended to and did effect a change of his domicile to Virginia.

The supporting acts and declarations may be briefly summarized as follows: Here was a Catholic priest who had retired from active service in his church. Contrary to the laws of that church he had married, and for the greater part of nearly two years had lived happily with his wife at Virginia Beach, where his priestly status was unknown. He stated to numerous persons there that he liked Virginia Beach and intended to make it his home if his wife would consent. She did consent. He announced this fact to many people, purchased a building site, and immediately began the erection of an expensive, private residence designed for year-round occupancy. In the meantime he had disposed of the home in which he had lived for many years in Newburgh. He removed his securities from the State of New York and placed them in a safe-deposit box in Virginia. He closed out his bank account in a New York bank and opened one in a bank located at Virginia Beach. He left nothing in the State of New York except his household furniture, which he placed in storage and arranged to have

transported to Virginia Beach. During all of this time he was actually residing at Virginia Beach.

And that is not all. Notwithstanding his marriage was contrary to the laws of his church, he was happy with his wife and had determined to live the remainder of his days with her. This, of course, he could not do at Newburgh without embarrassment to both her and himself. It was necessary that he establish a residence and domicile elsewhere. At Virginia Beach he had found the climate helpful and the surroundings pleasant. He determined, after his wife had consented, to locate there permanently.

It is true that only a short time before his death he visited his church at Newburgh, showed an interest in its affairs, and requested the payment of the accrued salary due him as pastor *emeritus*. This was in no way inconsistent with his plans for the future. Some details in connection with the disposition of his property there made it necessary for him to return to Newburgh. If he had failed to visit his church or the rectory, or had failed to accept the small salary paid him, this would have aroused comment and discussion and might have led to the disclosure of his marriage.

Obviously he thought the best way to allay suspicion was to make no noticeable change in his accustomed associations and walk of life while in Newburgh. The same object would be furthered if he kept his automobile registered in the State of New York and maintained his liability insurance there.

It is argued that the building of the house at Virginia Beach is equally consistent with the maintenance of his domicile at Newburgh; that what he intended was to establish a hide-out and not a home in Virginia; that his real purpose was to live during the winter months with his wife at Virginia Beach, and to resume his status as a Catholic priest upon his return to Newburgh in the summer without changing his domicile.

If this be so, then why the necessity of erecting a costly and permanent residence at Virginia Beach? Mrs. Hayes

had not demanded this. The idea was his and not hers. Why not continue to rent a temporary place for the occupancy of his wife and himself during the winter months, as he had already done for two seasons? This would have left him free to return to Newburgh, or even to establish a domicile elsewhere.

It must be remembered, too, that the building of a residence at Virginia Beach is but one of the circumstances on which the appellee's case rests. Added to this are other facts and circumstances already detailed.

A fair consideration of the whole evidence convinces us that in the winter of 1933-1934 Father Hayes abandoned his former domicile in Newburgh and established a new domicile at Virginia Beach.

The decree is

*Affirmed.*