Steven HATFILL, Plaintiff,

v.

Donald FOSTER, et al., Defendants.

No. 04CIV.9577 (CM)(GAY).

United States District Court,
S.D. New York.

Feb. 14, 2006.

Eric O. Bravin, Mark Andrew Grannis, Patrick Pearse O'Donnell, Tonya Mitchell, Thomas G. Connolly, Harris, Wiltshire & Grannis L.L.P., Washington, DC, for Plaintiff.

Kevin W. Goering, Sheppard, Mullin, Richter & Hampton, LLP, David A. Schulz, Michael D. Sullivan, Chad R. Bowman, Levine Sullivan Koch & Schulz,

L.L.P., Laura R. Handman, Davis Wright Tremainen LLP, New York City, Jay Ward Brown, Levine Sullivan Koch & Schultz, Washington, DC, Dirk Christian Phillips, Hogan & Hartson LLP, Matthew Roy Aloysius Heiman, McGuire Woods LLP, McLean, VA, for Defendants.

## DECISION AND ORDER REVISITING CHOICE OF SUBSTANTIVE LAW AND ORDER TO SHOW CAUSE

MCMAHON, District Judge.

### I. Introduction

In October 2003, defendant Conde Nast Publications published an article by defendant Donald Foster entitled "Message in the Anthrax," describing Foster's investigations into the 2001 anthrax attacks. Defendant Reader's Digest Association republished the article two months later, under the name "Tracking the Anthrax Killer." Both articles contained allegedly libelous statements imputing the anthrax attacks (and other unsavory activities) to Dr. Steven Hatfill, a medical doctor and leading expert on bio-terrorism.

In August 2004, Hatfill filed a complaint asserting state law claims for libel in the Eastern District of Virginia. That court granted defendants' motion to transfer venue to the Southern District of New York. In two 2005 decisions resolving defendants' various motions to dismiss, this Court determined that Virginia law should apply to the substantive issues in this case.

After those decisions came down, defendants belatedly challenged many of plaintiff's assertions as to his connections with the state of Virginia, and asked this Court to review the choice of law issue yet again. The court was reluctant to reopen the issue, especially since defendants had not bothered to ask for jurisdictional discovery while the various motions to dismiss (all of which implicated choice of law issues) were pending. However, after hearing from defendants' counsel about responses allegedly given by plaintiff in a deposition in his case against the United States Department of Justice concerning his residence at the time the articles here in suit were published, it seemed that misrepresentations might have been made to this court, and that the original choice of law decisions were predicated on erroneous impressions left by those misrepresentations. I *sua sponte* ordered a fifteen day period of jurisdictional discovery and directed additional briefing on the choice of law issue.

Based on the evidence now before me, I reverse my earlier determination and conclude that the governing substantive law as to all defendants in this case is Washington D.C., rather than Virginia, law.

### II. Facts

*A. Procedural History*

The background of this case is generally known, so I restate it only briefly.

In late 2001, an anonymous person or group mailed envelopes laden with weapons-grade anthrax to several high-profile targets on the East Coast, including NBC, the publisher of the National Enquirer, and the Capitol building. In the subsequent investigation, suspicion fell on Dr. Steven Hatfill, a biomedical researcher who allegedly had extensive training in biowarfare and access to the materials and equipment needed to create high-grade anthrax.

Hatfill was placed under close surveillance by federal law enforcement. In addition, amateur sleuths took up the investigation on their own. One of them was Donald Foster, a professor at Vassar College and a self-proclaimed practitioner of "literary forensics," the art of conducting criminal investigations based on clues in a suspect's use of written and spoken language.

These ongoing investigations, over time, put considerable stress on Hatfill's personal and professional lives. Ultimately they turned up no hard evidence linking Hatfill to the anthrax mailings. Neither Hatfill nor anyone else has been conclusively identified as the killer or charged with any crime related to the anthrax mailings.

In October 2003, Vanity Fair, a magazine owned by defendant Conde Nast Publications (CNP), published Foster's article "Message in the Anthrax." The article points to Hatfill as the anthrax mailer and blaming law enforcement for letting the trail grow cold. Two months later, Reader's Digest, a publication of defendant The Reader's Digest Association (RDA), published a version of the article entitled "Tracking the Anthrax Killer" which excised some of the more accusatory elements of the Vanity Fair article but retained the article's thesis linking Hatfill to the anthrax attacks.

In August 2004, Hatfill brought state law claims of libel and infliction of emotional distress against Foster, RDA, and CNP. The complaint was originally filed in the Eastern District of Virginia. In his complaint, Hatfill asserted that he was a resident of the District of Columbia, but suffered economic and reputational harm in Virginia. Cmplt ¶ 2.

Defendants moved to dismiss under Fed.R.Civ.P. 12(b)(6) and to transfer the case from the Eastern District of Virginia to the Southern District of New York under 28 U.S.C. § 1404.[1] In an affidavit attached to Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss, dated November 8, 2004, plaintiff stated that he rented a room in Virginia from a friend. Hatfill Affidavit, ¶ 9. He further averred that he possessed a Virginia driver's li-

cense and voter registration—two traditional indicia of domicile. *Id.* ¶ 10. Plaintiff claimed that he had been driven into Washington D.C. by the ongoing investigation, and averred that he intended to "return" to Virginia as soon as possible. *Id.*

In a decision from the bench issued November 19, 2004, Judge Brinkema granted defendants' motion to transfer, leaving unresolved all motions to dismiss.

In the text of Plaintiff's Consolidated Response addressing choice-of-law issues, the plaintiff did not argue that plaintiff was a Virginia domiciliary. Rather, he argued that Virginia law should apply because that was the state in which plaintiff suffered the greatest harm to his reputation. Pl. Consolidated Opposition at 43–49. However, plaintiff also hedged his bets by arguing that his citizenship in Washington D.C. (asserted in the complaint) was the "product of mere happenstance" and that "misfortunes" in his life (referring to the ongoing investigations) "have forced Dr. Hatfill to live outside his preferred state," which was Virginia. *Id.* at 48 n. 29. This assertion was credited by the Court. Indeed, I interpreted the words used by Hatfill and his counsel as indicating that he had been a Virginia resident (because he wanted to "return" there), but was abiding temporarily in Washington D.C. due to the publicity attendant to the investigation. It was with that understanding that I decided the issues presented.

In two opinions in the last year, this Court concluded that the law of Virginia governed the resolution of plaintiff's claims. *See Hatfill v. Foster*, 372 F.Supp.2d 725 (S.D.N.Y.2005) (hereinafter, *Hatfill I* ) and *Hatfill v. Foster*, 401

---

1. Defendants did not move under Fed. R.Civ.P. 12(b)(3) to dismiss on the grounds of improper venue. They have thus waived any argument that venue in Virginia was improper, rather than merely not convenient for the parties and witnesses under 28 U.S.C. § 1404.

F.Supp.2d 320 (S.D.N.Y.2005) (hereinafter, *Hatfill II* ).

In *Hatfill I* and *Hatfill II,* this court reached several conclusions that bear reassessment.

First, while accepting as true on a pre-answer motion to dismiss the assertion in the complaint that Hatfill was a citizen of Washington D.C., I remarked that Hatfill's citizenship allegation appeared to be contrary to reality, since he had most if not all of the traditional indicia of Virginia domicile.

Second, I concluded that Virginia was the primary locus of harm to the plaintiff. I did not accept plaintiff's assertion that the biological warfare industry was concentrated in Virginia, noting that it appeared to be concentrated in the Washington D.C. metropolitan area, including Northern Virginia and Maryland. However, I concluded that a combination of plaintiff's ties to Virginia (as evidenced by such things as his mailing address, voter registration, prior bioterrorism work in Virginia, and fixed intention to "return" to Virginia when he could do so), together with his chosen field's strong presence in Virginia, made Virginia the primary locus of harm. *See Hatfill I,* 372 F.Supp.2d at 731.

As a result, I concluded that, under Virginia choice-of-law rules, a Virginia court sitting in diversity would apply Virginia law to the claims asserted by plaintiff against CNP and RDA. *Id.* at 741.

In *Hatfill II,* in which I applied New York choice-of-law rules to decide what law governed the claims against Donald Foster, plaintiff asserted that he was domiciled either in Virginia or in Washington D.C. at the time the tort was committed (which was when the articles were originally published). *Hatfill II,* 401 F.Supp.2d at 325. I concluded that New York would

apply Virginia law to the claims against Foster as well.

All of this was predicated on my belief that plaintiff had been living in Virginia until he was "forced" to retreat to his girlfriend's home in the District of Columbia, which was intended to be a temporary abode until such time as he could return to his real home.

Defendants apparently had substantial reason to disbelieve at least some of plaintiff's averments. In papers filed before Judge Brinkema, they questioned several of Hatfill's assertions, including his residence in Virginia prior to the publication of the articles. Nonetheless, they did not ask Judge Brinkema to allow them to take jurisdictional discovery on the issue of plaintiff's domicile, so they could back up their questions with evidence. Nor did they ask me for leave to take jurisdictional discovery when the matter (and those motions) were transferred to this court. Indeed, defendants did not so much as hint that they needed to take jurisdictional discovery! Any such request, to this court, at least, would have been granted as a matter of course, given the analysis undertaken in *Hatfill I* and *Hatfill II.*

As a result, I decided the motion to dismiss on a record in which plaintiff's assertions concerning his connections with Virginia were neither tested via cross examination nor countered with *evidence* (as opposed to conjecture) that contradicted them.

At a status conference held on December 7, 2005, defendants suggested that they believed, based on testimony given during a deposition of plaintiff in a related case, that the assertions relied on by this Court were incorrect. They indicated an intent to ask for a reconsideration of the choice of law rulings at the conclusion of discovery. I instead set an accelerated

discovery and briefing schedule for the resolution of this issue.

It turns out that plaintiff and his lawyers pulled a fast one on the Court.

### B. The Real Story

The plaintiff Steven Hatfill was deposed on December 16, 2005, on the limited issue of his past domicile and residence. In that deposition, he communicated the following: [2]

Hatfill was born on October 24, 1953 in St. Louis, Missouri, and grew up in Mattoon, Illinois. Deposition of Steven Hatfill ("H. Dep.") at 13: 10–18. From the early 1980s until 1994, he lived in Zimbabwe and South Africa, where he earned a degree in medicine, a master's degree in medicine, and a doctorate in molecular cell biology (H. Dep., Exhibit 9). In April 1994, Hatfill left South Africa and returned to Florida, where he lived on his parents' horse farm, and helped painting barns (H. Dep. at 18:11—19:4). In early 1995, he took a one-year position at the Nuffield Department of Pathology at Oxford University in Oxford, England (H. Dep. at 20: 3–4).

Upon his return to the United States, Hatfill accepted a postdoctoral research position (called an Intramural Research Training Award), from the National Institutes of Health (NIH) (H. Dep at 22: 2–5). In January 1996, he moved to a house near the NIH campus in Bethesda, Maryland (H. Dep. at 23:15–17). He believes he executed a written lease with the owner (H. Dep. at 25:12–15). He shared the property with other tenants, although he had a basement apartment with a private entrance for at least part of the time (H. Dep. at 25: 4–15). He lived at that loca-

tion for over two years (H. Dep. at 26: 8–9).

In September, 1997, Hatfill left NIH and went to work at the U.S. Army Medical Research Institute for Infectious Diseases (USAMRIID) in Frederick, Maryland (H. Dep. at 15: 13–20). In early 1998, he left Bethesda and moved to Frederick (H. Dep. at 53: 12–14).

He remained at USAMRIID until approximately January 1999, when he took a job at Science Applications International Corporation (SAIC) (H. Dep. at 61: 14–17; 62: 4–6). He apparently split his time between USAMRIID and SAIC for a month before moving to SAIC full time (H. Dep. at 62: 9–14). During the first six months at SAIC, he worked out of an office in Baltimore (H. Dep. at 63: 2–7), after which he moved to the office in Tyson's Corner, Virginia (H. Dep. at 63: 6–7).

Hatfill claimed that the Frederick apartment was a temporary home. He referred to his parent's address in Florida as his permanent address during his deposition (H. Dep. at 55 6–8; 66:22–67:4). However, it appears that Hatfill's stay in Maryland lasted over five years. When required to provide an address for tax or employment benefit purposes, he used the address of the Frederick apartment (H. Dep. at 64: 11–15) although, as time progressed, he spent fewer nights per month in the apartment, and more time traveling for work or at the Washington D.C. apartment of Peck Chegne, his girlfriend (H. Dep. at 168: 12–20). At no time while he worked at SAIC did plaintiff live in Virginia.

At some point in the late 1990s, his parents sold the farm and moved to first one, then a second condominium in Pana-

---

**2.** The EBT was filed under seal by order of Judge Yanthis. The parties also filed their motion papers under seal. I have carefully reviewed the testimony to which I cite and I

see no reason why this opinion should be filed under seal. It contains no classified information.

ma City, Florida (H. Dep. at 28: 7–10). Hatfill had a bedroom in each of these apartments (H. Dep. at 208:8—209:3).

Hatfill was employed at SAIC's Virginia office both on September 11, 2001, and later that fall, when anthrax-laced envelopes were sent to New York, Washington, and Florida. Soon thereafter, he was preliminarily identified by law enforcement, as well as amateur investigators like Dr. Barbara Rosenberg (identified in the Vanity Fair article), as a "person of interest" in the investigation. Throughout 2002, Hatfill believed himself to be constantly under surveillance. His apartments in Washington and Maryland were searched on several occasions (H.Dep., Exh. 10.)

The investigation put pressure on Hatfill to leave SAIC, which he eventually did in the summer of 2002. In February 2002, he applied to enroll (perhaps as a student) at a Louisiana State University program on counter-terrorism (H. Dep. at 105:18–20). On his application, he provided the Frederick address and home phone (H. Dep. at 106: 8–9; Exh. 4). His application apparently sparked LSU's interest in hiring Hatfill as an instructor; by March 2002, he had completed an application packet, including a biographical data card (H. Dep. at 112: 7–13). He provided the Frederick address on this form as well (H.Dep., Exh. 5).

The only evidence of Hatfill's maintaining a residence in Florida during this period is the June 2002 reimbursement forms which he submitted to LSU after attending a professional conference (H. Dep. at 114:1–3). On his application to rent a car, he used his parents' Florida address, which corresponded to the address on his Florida license (H. Dep. at 115:1–11).

During the summer of 2002, Hatfill left SAIC as an employee, although he continued to do some consulting as a private contractor. (H. Dep. at 84: 2–7). He took a position at the U.S. State Department's Diplomatic Security Service (H. Dep. at 125: 11–12), believing that it would be a long term position (H. Dep. at 125: 15).[3] However, he stayed only a few months (H. Dep. at 126:1). In his application to the State Department, he listed his "temporary office" at 2828 Wisconsin Ave., which is Peck Chegne's address in Washington D.C. (H. Dep. at 126:5–8) and another office at LSU (H. Dep. at 127:3–4). He listed residences in Maryland and Florida (H. Dep. at 127:21–128:3). He did not list any residence in Virginia.

Some time later (Hatfill cannot recall when), his parents sold their property in Florida. His mother moved to a nursing home (H. Dep. at 129:6–11). His father returned to Mattoon, Illinois (H. Dep. at 129 15–19). Plaintiff does not have room in the Mattoon house and has never resided there.

Hatfill left the apartment in Frederick in August, 2002 (H.Dep., Exh. 8). He moved to Baton Rouge for what he believed would be a long term position at LSU (H. Dep. at 117: 6–18). However, the offer was rescinded. Having no other prospects in Louisiana, Hatfill left the state. He moved into Chegne's Washington D.C. apartment in October 2002 (H. Dep. at 131:17).

Details of Hatfill's life in the period after he returned to Washington D.C. are sparse. Hatfill claims that he was unemployed, and had little contact with the outside world for months (H. Dep. at 141:13–19).

---

**3.** This testimony does not square with Hatfill's plans to move to LSU, which had apparently been developing since the beginning of the year. I recite it because the record contains it.

In spring or summer of 2003, plaintiff gave an interview to Jason Cherkis of the Washington D.C. weekly *The City Paper* concerning the government investigation of his movements and his attempts to elude them. According to the article, Chegne's Washington D.C. apartment was decorated with Hatfill's personal effects: animal heads and skins, replica antique pistols, replica of Egyptian sarcophagus, and movie paraphernalia (H. Dep. at 135:10–18). The article also speaks of Hatfill's extensive work remodeling the apartment while unemployed. Hatfill has some complaints about the article (H. Dep. at 136: 1–5), but agrees that the broad elements of the description are correct (H. Dep. at 140: 14–21).

It is not clear how long Hatfill lived in Chegne's apartment. At one point, he testified that it was approximately 11 months (H. Dep. at 143: 19–22.) At another, he said that he stayed there "until I got my license back" (H. Dep. at 144: 2). That occurred in November 2004—closer to twenty-three or twenty-four months.

As the anthrax investigation heated up, Hatfill began to look for somewhere else to sleep, keep his belongings, receive mail, and use the phone (H. Dep. at 166: 4–7). After some searching, Hatfill entered into an oral lease with Boris Lederer, a friend and former co-worker at SAIC, for the use of one room in his home in Fairfax, Virginia, at a rent of one dollar per month, which Hatfill paid in cash (H. Dep. at 163: 3–7; 169: 7–17). The room was furnished with a futon, a closet, and a desk, all owned by Lederer, Hatfill's personal effects remained in Chegne's apartment. Lederer himself used the desk for business purposes (H. Dep. 172: 17–18).

Hatfill is less than precise about when he made this arrangement with Lederer. He first claimed that it was winter of 2002 (H. Dep. at 12: 3). He once drafted a document entitled "Residences" (although he does not remember when, or why, he created it (H. Dep. at 197: 8–11)) in which he claims to have leased the room beginning in March 2003 (H. Dep. at 197: 19–22; Exh. 15).

But Hatfill also indicates that the publication of the Foster article (by Vanity Fair in October, 2003 and by Reader's Digest two months later) was one of the reasons he sought to leave Washington D.C. (H. Dep. at 163: 19–21). And he testified that, "Reader's Digest was the last straw" (H. Dep. at 164: 11).

The July 2003 City Paper article, which describes Hatfill's Washington D.C. residence in great detail, makes no mention of any home in Fairfax. I therefore conclude that Hatfill did not rent the room in Virginia until after Foster's articles were published. Since Hatfill remembers that "it was cold outside" when he rented the room (H. Dep. at 165: 15–16), I conclude that he rented the room over the winter of 2003 to 2004.

In keeping with the nominal rent that he pays, Hatfill sleeps in Fairfax only two or three times per month (H. Dep. at 168: 3–6), either when he was fighting with Chegne or when he was working late (H. Dep. 170: 15–18). Since Hatfill was unemployed from the time he returned to Washington D.C. until 2005, he could not have slept in Virginia for work purposes prior to the commencement of this lawsuit in 2004. Also, Hatfill had no car and until the autumn of 2004 he had no driver's license. He could not legally transport himself to Fairfax unless someone drove him there.[4]

---

**4.** At one point in his deposition testimony, Hatfill comes close to admitting that drove while his license was suspended (H. Dep. at 149: 10–17 (stating that Chegne would drop him off in her car to pick up the truck in Virginia)). This fact would make much of the

*See* § II.C.1 *infra.* Hatfill testified that he did not drive while his license was suspended (H. Dep. at 231:10–19). Therefore, he could not have commuted to Virginia prior to the commencement of the lawsuit unless Chegne or someone else drove him there.

At several points in his testimony, Hatfill claimed not to have slept at the Fairfax apartment at all before he acquired a Virginia driver's license. That occurred in September 2004—after not only publication of the articles but commencement of this lawsuit in Virginia (H. Dep. at 231: 10–19).

Hatfill did not acquire phone service for "quite a while" after making his arrangement to rent the room from Lederer (H. Dep. at 183: 14–16). According to Verizon's records, Hatfill commenced phone service on September 3, 2004 (H. Dep. at 184: 12–22; Exh. 13). Chegne currently pays the bill on her home computer, although Hatfill gives her the money to pay it (H. Dep. at 187: 13–15).

Most of Hatfill's mail is now delivered to the Fairfax address. He cannot recall when he began to have mail sent to Fairfax, rather than to Chegne's apartment (H. Dep. at 153: 10–16). Most of his personal items and possessions are still in Washington (H. Dep. at 151: 3–7).

In 2005, after two years of unemployment, Hatfill began consulting for Assessment and Training Solutions (ATSCC), a security consulting firm headquartered in Virginia Beach, Virginia (H. Dep. at 85: 5–9). He claims to be planning a permanent move to Virginia with Chegne (H. Dep. at 176:1).

## C. Other Indicia of Domicile

In addition to his personal history, Hatfill testified to various indicia of domicile that he possessed in the years surrounding the time of publication.

### 1. State-issued Licenses and Permits

Hatfill, a medical doctor, has never had a license to practice medicine in the United States (H. Dep. at 131: 1–3). His South African license to practice has expired (H. Dep. at 130:7).

Upon his return to the United States in 1994, or perhaps 1995, he acquired a Florida driver's license (H. Dep. at 29: 3–7). He apparently used the address of his parents' farm on Northwest Circle in Ocala, Florida (H. Dep. at 28: 15–18). While in Florida, he also leased a Mazda (H. Dep. at 68: 3–5). The car was registered and insured in Florida (H. Dep. at 69: 2–6; 71: 12–14). He renewed the Florida license at least once, possibly also changing his address on the renewal to that of his parents' condominium in Panama City (H. Dep. at 29: 8–12).

While working at USAMRIID, the Mazda lease expired and Hatfill leased a new Chevy Camaro (H. Dep. at 73: 1–7). The car was registered in Maryland (H. Dep. at 73: 8–11). Hatfill does not recall whether he insured the car using his Maryland or Florida address (H. Dep. at 74: 7–13). Two and a half years into the first Camaro lease, he leased a second Camaro. The lease and registration were executed in Florida (H. Dep. at 92: 4–11).

In the summer of 2002, Hatfill was pulled over by the police on suspicion of DUI (H. Dep. at 33 3–7; 147: 3–7). He refused to take a blood alcohol test at the scene (H. Dep. at 33: 12–13), and the

rest of his testimony considerably more plausible. However, since he testified that he did not do so, he will be bound by that testimony

for purposes of this motion. Hatfill makes no mention of ever taking public transportation to Fairfax.

Florida Department of Motor Vehicles apparently suspended his license.

Around November 2002, Hatfill (who claims to have been unaware that his license was suspended) leased a Chevrolet pick-up truck. The truck was originally leased from a Virginia dealer. It was registered in Virginia (H. Dep. at 94: 6–10).

Shortly after he leased the pick-up truck, Hatfill's insurance carrier notified him that his policy was no longer valid (H. Dep. at 146: 1–7). This was apparently when he learned that his license had been suspended. *Id.* After a year, he appealed the suspended license to an "adjudicator," who modified the terms of his suspension to run for one more year (H. Dep. at 33: 18–22). It appears that he was unable to drive legally until September 24, 2004, when he finally obtained a Virginia license (H. Dep. at 32: 4–6; Exh. 1).

It is not clear what Hatfill did with the truck during this period, since he claims not to have driven while his license was suspended. He testified that he left it at the Fairfax house some of the time (H. Dep. at 149: 10–15). Halfway through the three-year lease, Hatfill transferred the lease to Chegne, who re-registered the vehicle in Washington D.C. (H. Dep. at 95: 19–21).

### 2. Tax returns

Hatfill does not remember what address was used on tax returns from 1995 to 2001, and did not keep copies of his returns (H. Dep. at 41: 2–6; 43: 8–1455:12–22; 75: 1; 76: 17–19; 77: 20–22). According to copies of what are apparently Hatfill's tax returns, he listed his apartment in Frederick Maryland as his address from 1998 to 2001 (Def's Motion, Exhibit D). In 2002, he filed a federal tax return listing Chegne's address in Washington D.C. as his home (H. Dep. at 83 1–9). He also filed a resident state tax return in Mary-land and non-resident return in Louisiana (H. Dep. at 79 13–19; Exh. 2). Hatfill's returns were prepared by a Mr. Peter Canonico of Valley Tax Service. (H.Dep., Exh. 2).

Hatfill did not file tax returns for 2003 or 2004, because he had no income (H. Dep. at 169: 21–22).

After being hired at the NIH, Hatfill opened an account at the NIH Federal Credit Union (H. Dep. at 46: 1–2). He provided his Bethesda address to the bank, and remembers getting receipts at that address (H. Dep. at 45: 11–14). He might have provided the Florida address as well (H. Dep. at 45: 19–22). He also had a credit or debit card from NatWest; perhaps from his sojourn in Oxford. He does not remember where those statements were sent (H. Dep. at 48: 4–10).

After leaving NIH and moving to Frederick, Maryland, Hatfill switched to the Frederick branch of the Sun Trust Bank. (H. Dep. at 60: 14–16). He got a new debit card from that bank. Statements were sent to the Frederick residence (H. Dep. at 49: 12–14). He claims that the statements might also have been sent to his office at Tyson's Corner, but offers no copy of a statement so addressed (H. Dep. at 97:22–98:1). He also recalls having a money market account at Sun Trust (H. Dep. at 99:21–100:8), although that account is now closed (H. Dep. at 100:19).

At some point between mid–2003 and early 2004, Hatfill opened a second account at the Sun Trust branch in Tenley Circle in Washington D.C. (H. Dep. at 102: 7–12). Statements were first sent to Washington D.C., and then to his Fairfax address (H. Dep. at 102: 17–22). He continues to maintain a checking account at the Frederick Sun Trust branch as well (H. Dep. at 100:20–22).

Hatfill also has a joint savings account with his father at a bank in Mattoon IL. Statements are sent only to his father in Illinois (H. Dep. at 99: 1–11).

### 3. Voter Registration

Hatfill registered to vote in Florida upon his return to the United States (H. Dep. at 34: 19–21). He removed himself from the Florida rolls after moving to Maryland, apparently to avoid being called for jury duty in Florida (H. Dep. at 35: 13–18). He did not, however, register to vote in Maryland. Hatfill did not re-enroll until September 22, 2004—after this suit was filed—when he registered to vote in Virginia (H. Dep. at 38 6–8; Exh. 2).[5]

### 4. Social Organizations.

Hatfill does not attend church (H. Dep. at 40: 12–19). He is a Mason, and is enrolled in the Blue Lodge in Maryland (H. Dep. at 225: 15–20). He sought to join the McLean, Virginia lodge while resident in Bethesda but was denied; he did not seek re-admission at any other time (H. Dep. at 226: 7–12). He keeps his dues current but does not attend lodge meetings at present (H. Dep. at 226: 19–22). He was (and remains) a member of certain professional organizations in the fields of medicine and bio-research, but has no extensive contacts with those organizations.

## III. Discussion

### A. Choice of Substantive Law as to CNP and RDA

■ Where a change of venue is granted under 28 U.S.C. § 1404, the transferee court applies the choice of law rules of the transferor court. *See Ferens v. John Deere Co.*, 494 U.S. 516, 519, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990). Since

both CNP and RDA were subject to personal jurisdiction in Virginia, Virginia choice-of-law rules govern the claims against Conde Nast and Reader's Digest.

■ The determination of which state's law applies is made in light of the facts that existed at the time of the tort—that is, publication of the articles.

■ Virginia follows the "traditional" choice-of-law approach: it applies the *lex loci delecti*, or the law of the place of the tort, to issues of substantive law. *See Jones v. R.S. Jones & Assoc's, Inc.*, 246 Va. 3, 5, 431 S.E.2d 33, 34 (1993); *McMillan v. McMillan*, 219 Va. 1127, 253 S.E.2d 662, 663–64 (1979). According to the First Restatement of Conflict of Laws, the place of the tort is the state "where the last event necessary to make an actor liable for an alleged tort takes place," which in all but a few cases is the injury felt by the plaintiff. Restatement (First) of Conflict of Laws § 377 (1934).

The traditional rule has been considered inexact in cases of libel arising from multi-state publications. Some courts have called the old rule "cumbersome, if not impossible" to apply where the plaintiff's reputation is allegedly injured in several states by the same aggregate publication. *Wells v. Liddy*, 186 F.3d 505, 527 (4th Cir.1999).

■ However, in practice, lex loci jurisdictions have shown remarkable consistency in how to resolve the question. The vast majority of such districts look to the law of the jurisdiction where the plaintiff suffered the greatest injury. Moreover, that district is usually the one in which the plaintiff was domiciled. *See Wells v. Liddy*, 186 F.3d 505, 528 (4th Cir.1999) (inter-

---

**5.** Hatfill at one point also says he registered on December 2, 2004, a month after Election Day (H. Dep. at 193: 19–21).

preting Maryland law); *Miller v. Lear Siegler, Inc.*, 525 F.Supp. 46, 56 (D.Kan.1981); *Lewis v. Reader's Digest Ass'n, Inc.*, 162 Mont. 401, 407, 512 P.2d 702 (Mont.1973). Virginia has not specifically addressed this question, but I find that they would follow the lead of other lex loci jurisdictions and pinpoint the place of greatest harm in this multistate libel case in the district where the plaintiff was domiciled, absent strong countervailing circumstances.

In light of the record before me, I can conclusively say the plaintiff was not domiciled, or even resident, in Virginia at the time Foster's articles were published—or, for that matter, at any time prior to publication.

■ Residence in a jurisdiction is a necessary, but not sufficient, factor in establishing domicile. *Blackson v. Blackson*, 40 Va.App. 507, 520, 579 S.E.2d 704 (Va. App.2003). "The critical requirements of establishing domicile is the absolute good faith in taking up such residence and the *animus manendi* (intent to remain)." *Id.* In determining indicia of residence and a party's intent to establish domicile, courts look to the party's presence in the state, his ownership of property, and other indicia of residence such as driver's licenses, voter registration, employment, payment of state taxes, and other social or business relationships with the state.[6] *See Guilfoil v. Hayes*, 169 Va. 548, 556–57, 194 S.E. 804 (1938). While a party's own statements about their chosen domicile are to be considered, "Evidence of expressed intent has no controlling weight if such an intent is inconsistent with the acts and general conduct of the person. In such a case, acts and conduct showing intent outweigh his

declarations or expressions of intent." *Id.* at 556, 194 S.E. 804 (citing *Bowen v. Commonwealth*, 126 Va. 182, 190, 101 S.E. 232 (1919)).

■ Virginia adheres to the majority position that an individual has but one domicile, which remains constant until the domiciliary affirmatively rejects it and acquires a new one. "Until a new domicile is acquired, the old one remains, and whenever a new domicile is alleged, the burden rests upon the party alleging it." *State–Planters Bank & Trust Co. of Richmond v. Virginia*, 174 Va. 289, 295, 6 S.E.2d 629 (Va.1940); Virginia, by statute, requires clear and convincing evidence of a change of domicile in certain contexts, *see* Va.Code Ann. § 23–7.4(B). While its courts have not articulated the burden of proof required to establish domicile for common-law purposes (such as choice of law), I have no reason to believe that Virginia courts would apply less than its statutory standard to such matters.

■ However, it matters little. Not only is there no clear and convincing evidence that plaintiff was a Virginia domiciliary in the Fall of 2003, when the articles were published, there is no such evidence at all. Nor is there any evidence that plaintiff was or had ever been resident in Virginia prior to that date.

Hatfill's own testimony establishes that he did not leave Washington D.C. until after the publication of the Foster articles. Until then, he had never lived in Virginia. He resided in the District of Columbia, and prior to that in Maryland. He had no indicia of domicile (driver's license, voter registration, bank accounts, tax returns,

---

**6.** Virginia has since codified the test for domiciliary intent in certain specific cases, such as applications for college tuition benefits for in-state students. *See* Va.Code Ann. § 23–7.4(B). There is no evidence in the statute

that it is meant to apply as a general definition of domicile in any other context. Thus, while informative, § 23–7.4 does not govern my determination of domicile for choice-of-law purposes.

etc.) in Virginia prior to publication of the articles that are the subject of this lawsuit.

As to Hatfill's assertion that accusations against him "forced him to live with someone else, a District resident . . . but he still hopes to *return* to Virginia permanently" (Pl.'s Cons.Opp. at 34): counsel's deliberate use of the word "return" was clearly intended to—and did—deceive the Court into thinking that Hatfill had lived in Virginia prior to taking up residence with Chegne in Washington D.C. That is simply not the case. At the time of publication, the only place to which Hatfill could have "returned" from his "temporary" home in the District of Columbia was Maryland.

As a result, this Court's prior finding of that Hatfill had established domicile in Virginia is withdrawn.

■ The record strongly supports a finding of domicile in Washington D.C., where plaintiff moved, together with all the trappings of his life, after he returned from his brief sojourn in Baton Rouge. He made no effort to re-establish domicile in Maryland when he left Baton Rouge. He took up residence in Chegne's apartment, and remained there for over a year. The things most important things to a person's daily existence—his personal possessions, his financial assets and bank account, and his girlfriend—were all located in Washington D.C. Under Virginia choice of law rules, the law that applies is that of the District of Columbia, unless there is some other factor that trumps domicile. On the record before me, there is none.

I concluded earlier that Hatfill's business reputation suffered the most in Virginia. See *Hatfill I,* 372 F.Supp.2d at 732. But I reached that conclusion in part by crediting plaintiff's assertions that he had extensive permanent contacts with Virginia. I now know that plaintiff had virtually no contacts with Virginia at that time. Therefore, I must revise my assessment about where he felt the most professional injury.

The plaintiff suggests that his employment in Virginia as such a factor. However, he was unemployed at the time of publication and had been unemployed for more than a year. He had previously worked in the District of Columbia, Virginia, Maryland, and, it seems, Louisiana. Neither Virginia nor Maryland has any particular precedence—he had worked in Maryland for longer, in Virginia more recently. However, he had left his one Virginia job at least 15 months before the first article was published in Vanity Fair.

Plaintiff cannot hang his hat on the supposed preeminence of biotechnology in Virginia. I concluded, in *Hatfill I,* that there was no evidence that plaintiff's chosen field was more present in Virginia than it was in the rest of the Washington D.C. metropolitan area generally. *Id.* He thus suffered injury to his reputation in at least three jurisdictions—Virginia, Washington D.C., and Maryland. I grounded my conclusion that plaintiff's reputation suffered most greatly in Virginia because the significant biotech presence in Virginia could be coupled with plaintiff's many purported personal contacts there. But it turns out that he had no personal contacts with Virginia at the time the articles were published. Thus he could not have suffered a greater injury to his reputation in Virginia than he did in Washington D.C. or Maryland—perhaps less.

Since there is no countervailing reason to find that Hatfill suffered a greater injury to his reputation in Virginia than anywhere else, I conclude, consistent with Virginia law, that he suffered the greatest harm in the place where he was domiciled at the time of the tort. That was Washington D.C.

Notwithstanding the above analysis, plaintiff offers two other justifications for the application of Virginia law. First, he argues that a Virginia court, as the forum, would simply apply its own law to a case of multi-state defamation. Second, he contends that the tortious articles were published in Virginia (notwithstanding their publication elsewhere), making Virginia the place of publication and therefore the locus of the tort. These two arguments are easily rejected.

■ Virginia courts have been happy to avoid lengthy choice-of-law analyses and apply local law, but only if the parties do not dispute its application. *See Wiest v. E–Fense Inc.,* 356 F.Supp.2d 604 (E.D.Va. 2005); *Ditton v. Legal Times* 947 F.Supp. 227 (E.D.Va.1996). However, where the parties *do* disagree as to the applicable law, there is no principled reason to apply the forum state's law for its own sake. Such a rule would encourage all the evils that the *lex loci* principle seeks to avoid: it would encourage forum shopping (as appears to have been the case here); it would subject potential defendants to unpredictable governing law; and would give undue power to plaintiffs, who could select both forum and applicable law unilaterally.

■ Plaintiff's second proposed rule, that the First Restatement's "place of publication" rule permits the use of the law of any state in which an article is published, does not square with Virginia's definition of libel. At the time the *lex loci* rule was developed, libel law considered each "publication" to be a separate tort, so any state in which a libelous communication was published was the site of a separate tort. But that view has been supplanted by the "single publication" rule, which provides that a widespread publication of a single tortious statement (through multiple copies of the same publication, for example) is a single tort. Virginia courts have implic-

itly, if not explicitly, adopted the single publication rule. *See Armstrong v. Bank of Am.,* No. L189783, 61 Va. Cir. 131 (Va. Cir. Ct. Feb. 6, 2003); *Moon v. CBS Inc.,* No. LD–1544, 7 Va. Cir. 68, (Va. Cir. Ct. June 29, 1981); *see also Morrissey v. William Morrow & Co., Inc.,* 739 F.2d 962, 967 (4th Cir.1984).

In light of Virginia's adoption of the "single publication rule," the fact that the article was published in Virginia at the same time it appeared in every state of the Union provides no guidance to a court confronted with a choice of law question.

■ While rejecting Virginia as the source of law in this case, I cannot do as Conde Nast and Reader's Digest wish and apply New York law. New York is not the locus of the tort simply because Vanity Fair and Reader's Digest are published (in the economic, rather than legal, sense) and enjoy the greatest circulation here, as argued by defendants. Def. Motion at 18. Virginia has never applied a "widest circulation" test to determine the place of the tort, nor does any other *lex loci* jurisdiction of which I am aware. The issue is where plaintiff was domiciled, not where defendants keep their offices. Plaintiff has never lived—or worked—in New York. Even under the broadest reading of the facts, Hatfill's injury was not suffered principally in New York.

### B. Choice of Law as to Donald Foster

I apply New York choice-of-law principles to the claims against the third defendant, Donald Foster. However, for reasons largely articulated in *Hatfill II,* the substantive law governing the claims against Foster will also be that of Washington D.C., Hatfill's domicile at the time of publication.

While New York, unlike Virginia, has adopted "interest analysis" in place of the

traditional *lex loci* rule, it has also tended to look to the law of the place of the tort for "conduct-regulating" rules, such as the substantive law of libel and its defenses. *See Hatfill II,* 401 F.Supp.2d at 324 (citing *Padula v. Lilarn Prop. Corp.,* 84 N.Y.2d 519, 522, 620 N.Y.S.2d 310, 311, 644 N.E.2d 1001 (1994)). In cases of multi-state libel, a subject that New York courts have addressed with some frequency, they have shown a tendency to apply the law of the plaintiff's domicile. *See id.* at 324–25 (collecting cases).

 New York, like Virginia, would conclude that plaintiff's domicile at the time of the tort was Washington D.C. New York, like Virginia, defines domicile in terms of the "union of residence in fact and an absolute and fixed intention to abandon the former and make the new locality a fixed and permanent home." *Hosley v. Curry,* 85 N.Y.2d 447, 451, 626 N.Y.S.2d 32, 649 N.E.2d 1176 (1995). Like Virginia, New York permits a party to have but one domicile at a time. And New York, like Virginia, requires "clear and convincing" evidence before it will recognize a change of domicile. *See id.* at 451, 626 N.Y.S.2d 32, 649 N.E.2d 1176.

 For the reasons already articulated, New York courts would conclude that plaintiff's domicile at the time the articles were published was Washington D.C. Since New York courts in multi-state tort cases usually apply the law of the place of the plaintiff's domicile, this court should presumptively apply District of Columbia law to plaintiff's claims against Foster. No other possible jurisdiction (Virginia, Maryland, New York) has a stronger claim to have its law applied.

Moreover, as this Court stated in *Hatfill II,* New York courts have strongly favored the application a single state's law to cover multi-state torts such as multi-state libel. *See Hatfill II,* 401 F.Supp.2d at 325.

Since the court will apply Washington D.C. law to the claims against the publishers of the articles, it ought to apply the same law to claims against the author arising out of the same articles.

In view of these two well-established principles—one favoring the law of plaintiff's domicile and one favoring application of one state's law to claims arising out of the same tortious act (which, as I noted in *Hatfill II,* is publication, not composition)—Foster's arguments for the application of New York law under the state's "center of gravity test" are unconvincing.

Nor would the so-called "nine factor test" result in application of New York law to Hatfill's claims against Foster, for the reasons articulated in *Hatfill II. See* 401 F.Supp.2d at 325–26. The only difference between *Hatfill II's* discussion of the nine factor test and this one is that the reference to plaintiff's domicile at the time of the tort needs to be changed from Virginia to Washington D.C. Otherwise, the prior analysis remains intact—including the fact that use of the nine-factor test has been deprecated in recent New York decisions and does not likely represent the law of New York in multi-state libel cases.

Finally, plaintiff argues that this Court should not make any choice of law ruling until a substantive question arises in the case, on the grounds that a choice of law determination can only be made in light of the factual and legal question before the Court. That is absurd. Choice of law issues are determined based on settled principles, not on how facts (other than jurisdictional facts) pan out in discovery. It is the intention of this Court to determine the applicable law now, so that this lawsuit can move toward a conclusion. The scope of libel law and the available defenses thereto are the only significant legal matters in this case, and they will be

resolved by applying the law of the District of Columbia.

## IV. Order to Show Cause Why Plaintiff's Counsel's Pro Hac Vice Status Should Not Be Revoked

I cannot overstate my displeasure with defendants' lawyers. They waited until this Court had expended literally hundreds of hours of scarce time, researching and writing two lengthy opinions on the issues of jurisdiction and choice of law, before raising and briefing the choice of law question properly. When such issues are presented and defendants doubt plaintiff's position, it is up to zealous defense counsel to take timely jurisdictional discovery, so that the Court has accurate information on which to base its decision. Defense counsel have poorly served both their clients and the Court by the manner in which they have handled this issue.

If defendants plan to move for sanctions against plaintiff and his counsel as a result of this ruling, they should think again. Because defense counsel had it in their power to see to it that the issue was correctly decided the first time, they are as responsible as anyone else for the additional attorneys' fees that were incurred to set the record straight. It is strictly between counsel and their clients as to whether those fees are paid. I will not order plaintiff to pay them.

 However, defendants' counsel's behavior pales next to what appear to be serious, not to say blatant, misrepresentations and omissions made by plaintiff's counsel in their zeal to press the argument that Virginia's plaintiff-favorable law governs in this action. Although counsel claimed District of Columbia citizenship in the complaint, they argued in papers they originally filed before Judge Brinkema, and again in the papers filed directly with this court, that their client's domicile at the time of the tort could be found to be either Virginia or Washington D.C. There is absolutely nothing in the record to support such an argument. To try to support their position, counsel argued that Hatfill possessed numerous indicia of Virginia domicile—fairly implying that their client was possessed of those attributes at the only relevant time (the moment of publication)—despite the fact that their client had NONE of the indicia of Virginia domicile at the time publication occurred, or at any time prior thereto. And counsel wrote that their client intended to "return to Virginia" after the anthrax investigation ended, when he could not have "returned" there since he had never been there in the first place. Hatfill never lived, voted, had any bank account or obtained any license for any purpose in Virginia prior to the filing of this lawsuit. His only prior contact with the Commonwealth was a job that he started in 1999 and left in 2002—to which he commuted from Maryland.

Counsel had to know that, for choice of law purposes, the plaintiff's domicile is determined at the time of publication. Consistent with Fed.R.Civ.P. 11, counsel should have known what the facts were concerning their client's residence and domicile at the time of publication when they made their arguments to this court and the prior court. This court believes that counsel *did* know what the facts were—as evidenced by the plaintiff's sudden acquisition of many indicia of Virginia domicile shortly after the filing of this action. It smacks of collusion that plaintiff acquired a Virginia telephone number, driver's license and voter registration in September 2004. And it smacks of fraud on the court that this Court was told only that plaintiff had these indicia of Virginia domicile, not when he acquired them— even though when he acquired them was relevant to the legal issues the court had to determine.

Plaintiff's counsel are not members of the Bar of the Southern District of New

York. They are admitted *pro hac vice* only. This court is not required to permit, and will not permit, lawyers who engage in shady practice to appear before it as its guests.

Thomas G. Connolly and Mark A. Grannis of the law firm of Harris Wiltshire & Grannis LLP are hereby ordered to show cause why this Court should not revoke their admission pro hac vice and report this deception to the Bar of any State in which they are licensed to practice law. Papers in response to this order to show cause must be filed no later than February 24, 2006. No adjournment will be granted for any reason. As I imagine that the responsive papers will contain privileged material, they are not to be served on opposing counsel, and they will be filed under seal.

The court will decide this issue promptly. All proceedings in this action are stayed pending determination of the status of plaintiff's counsel. If pro hac vice status is revoked, plaintiff will be given 60 days to locate new counsel. All proceedings are stayed until issues relating to plaintiff's representation have been resolved.